UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------X

UNDERPINNING & FOUNDATION SKANSKA, INC.,

               Plaintiff,

    - against –

TRAVELERS CASUALTY AND SURETY COMPANY OF
AMERICA,

               Defendant.

-----------------------------------------X

NOT FOR PUBLICATION

**MEMORANDUM AND ORDER**
07-CV-5415 (KAM) (VVP)

MATSUMOTO, United States District Judge:

       Plaintiff Underpinning & Foundation Skanska, Inc.

("plaintiff" or "Underpinning") commenced this diversity

action seeking recovery under a payment bond issued by

defendant Travelers Casualty & Surety Company of America

("defendant" or "Travelers") to non-party general

contractor Marson Contracting Co., Inc. ("Marson"), for

work performed on a construction project pursuant to a

subcontract between plaintiff Marson.  (*See generally*, ECF

No. 1, Complaint ("Compl.") ¶¶ 5-6, 18-19, 22, 24-28; *see*

*also* ECF No. 40, Declaration of David Coleman, dated 1/4/10

("Coleman Decl."), Ex. A, Trade Contract between Marson and

Underpinning to Perform Caisson & Pile Foundation (the

"Subcontract").)  Plaintiff alleges that it performed its

obligations under the Subcontract with Marson and incurred

additional expenses, but Marson underpaid plaintiff.

(Compl. ¶¶ 14-16.)

Presently before the court is plaintiff's motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 40, Notice of Motion.) Travelers asserts numerous defenses and eight setoffs against plaintiff's payment claim. Plaintiff contends that there is no basis for Travelers's defenses and six of the eight setoffs, and plaintiff therefore claims that it is entitled to recovery under the payment bond for expenses covered under the Subcontract, plus interest. (*See* Notice of Motion at 1.) For the reasons that follow, plaintiff's motion for partial summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1, are undisputed unless otherwise indicated. The court has considered whether the parties have proffered admissible evidence in support of their positions and has viewed the facts in a light most favorable to the nonmoving defendant.

On or about December 21, 2005, non-party Schermerhorn, L.P. (the "Owner") entered into a contract with general contractor Marson for the construction of a project known as 160 Schermerhorn Street in Brooklyn (the "Project"). (ECF No. 37, Defendant's Statement of Material

Facts and Counterstatement ("Def. 56.1 Stmt.") ¶ 48.) On the same date, defendant Travelers, as surety, and Marson, as principal, executed and delivered to the Owner, as obligee, a payment bond in the amount of $40,390,000.00 for the work of Maron's subcontractors. (ECF No. 40, Declaration of Alan Winkler, Esq., dated 1/5/10 ("Winkler Decl."), Ex. A, Payment Bond.) Under the Payment Bond, Travelers guaranteed prompt payment to subcontractors and suppliers of any undisputed amounts for work performed and materials supplied in connection with Marson's work on the Project. (*Id.* §§ 1, 6.)

Thereafter, Marson, as general contractor for the Project, and plaintiff, as a subcontractor, entered into a Subcontract, dated January 5, 2006, pursuant to which plaintiff agreed to furnish and perform caisson foundation work and install solider piles in connection with the Project. (ECF No. 40, Plaintiff's Statement of Material Facts ("Pl. 56.1 Stmt.") ¶ 1; *see* Subcontract ¶ 2 and Ex. 3 thereto, Scope of Work Rider; Coleman Decl. ¶ 2.) The Subcontract was signed by Underpinning on May 15, 2006 and by Marson on September 6, 2006. (Coleman Decl. ¶ 2; Subcontract at 43.)

The agreed price for the Subcontract was $3,900,000.00, "which shall be deemed to be the total

3

amount due to [Underpinning] for the complete performance

of [Underpinning's] Scope of Work . . . ." (Subcontract ¶

1.) The Subcontract provides, however, that Underpinning

"shall be entitled to compensation for 'extra work'" in the

event a decision by the Owner, the architect for the

Project, or the general contractor, Marson, acting on

behalf of the Owner, increases the scope of work agreed to

be undertaken by Underpinning. (Subcontract § 2(f).)

Underpinning asserts that it "performed the

caisson foundation work for the Project" as well as "extra

work" and that it is entitled to compensation for work

performed and related expenses. (*See* Pl. 56.1 Stmt. ¶¶ 4-

5.) Defendant "admits that Underpinning performed most of

the caisson foundation work, but denies that Underpinning

performed, or performed correctly, all of Underpinning's

work." (Def. 56.1 Stmt. ¶ 4.) Further, defendant asserts

that plaintiff "is neither a proper beneficiary nor

claimant under the Travelers'/Marson labor and material

payment bond." (*Id.* ¶ 7.)

In its initial disclosures pursuant to Fed. R.

Civ. P. 26(a),[1] defendant asserted numerous setoffs and

---

[1] Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires
a party to produce as part of its initial disclosures,
*inter alia*, "a computation of each category of damages
claimed" and to "make available for inspection" the

defenses to plaintiff's demand for payment under the
Payment Bond. (See Winkler Decl., Ex. D, "Def. Rule 26
Disclosures".) To avoid repetition, the factual background
relevant to each disputed setoff or defense is set forth
below, together with the accompanying legal discussion.

## DISCUSSION

### A. Standard of Review

A court may grant summary judgment only "if the
pleadings, the discovery and disclosure materials on file,
and any affidavits show that there is no genuine issue as
to any material fact and that the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).
The moving party carries the burden of demonstrating the
absence of a genuine issue of material fact. *Celotex Corp.
v. Catrett*, 477 U.S. 317, 323 (1986). The court must
construe the facts in the light most favorable to the
nonmoving party and all reasonable inferences and
ambiguities must be resolved against the moving party.
*Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir.

documents on which the damage computation has been made.
Under Rule 37, "[i]f a party fails to provide such
information . . . as required by Rule 26(a) . . ., the
party is not allowed to use that information . . . to
supply evidence on a motion, at a hearing, or at a trial,
unless the failure was substantially justified or is
harmless." Fed. R. Civ. P. 37(c)(1).

2001); *see Global Network Communs., Inc. v. City of New York*, 562 F.3d 145, 150 (2d Cir. 2009).

"In New York, a bond is a contract and we therefore 'look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond.'" *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 n.4 (2d Cir. 2009) (quoting *United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 51 (2d Cir. 2004)); *see EM Ltd. v. Republic of Argentina*, 382 F.3d 291, 292 (2d Cir. 2004) (noting that a dispute over the meaning of a bond "present[s] . . . a simple question of contract interpretation").

The Second Circuit has articulated "specific standards" applicable to summary judgment motions predicated on a contract dispute:

> In determining a motion for summary judgment
> involving the construction of contractual
> language, a court should accord that
> language its plain meaning giving due
> consideration to the surrounding
> circumstances and apparent purpose which the
> parties sought to accomplish.  Where
> contractual language is ambiguous and
> subject to varying reasonable
> interpretations, intent becomes an issue of
> fact and summary judgment is inappropriate.
> The mere assertion of an ambiguity does not
> suffice to make an issue of fact.  Ambiguity
> resides in a writing when--after it is
> viewed objectively--more than one meaning
> may reasonably be ascribed to the language
> used.  Only where the language is

> unambiguous may the district court construe
> it as a matter of law and grant summary
> judgment accordingly.

*Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir.

2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d

Cir. 1990)). Thus, "[t]he initial question for the court

on a motion for summary judgment" concerning a contract

claim "is whether the contract is unambiguous with respect

to the question disputed by the parties." *Continental Ins.*

*Co. v. Atlantic Cas. Ins. Co.*, 603 F.3d 169, 180 (2d Cir.

2010) (citation and internal quotation marks omitted).

"Whether the contract is unambiguous is a question of law

for the court." *Id.* (citation and internal quotation marks

omitted).

"Where the parties dispute the meaning of

particular contract clauses, the task of the court is to

determine whether such clauses are ambiguous when read in

the context of the entire agreement, and where

consideration of the contract as a whole will remove the

ambiguity created by a particular clause, there is no

ambiguity . . . ." *Law Debenture Trust Co. v. Maverick*

*Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (citations and

internal quotation marks omitted). "Further, the courts

may not by construction add or excise terms, nor distort

the meaning of those used and thereby make a new contract

7

for the parties under the guise of interpreting the writing." *Id.* at 468 (citation and internal quotation marks omitted). Significantly, "[a] contract is not ambiguous merely because the parties argue for different interpretations . . . ." *Chiquita Int'l Ltd. v. Liverpool and London S.S. Prot. & Indem. Ass'n Ltd.*, 124 F. Supp. 2d 158, 164 (S.D.N.Y. 2000) (citing *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)).

"Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no reasonable person could decide to the contrary.'" *New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010) (quoting *Compagnie Financiere De Cic Et De L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 158 (2d Cir. 2000)). "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving

party's case." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526
F.3d 63, 68 (2d Cir. 2008) (citation omitted).

**B. Travelers's Obligations under the Payment Bond**

As a threshold matter, the court addresses
defendant's contention that plaintiff is not a "proper
beneficiary []or claimant" under the payment bond. (*See*
Def. 56.1 Stmt. ¶ 7.)  It is undisputed that Marson
obtained the Payment Bond from defendant, pursuant to which
defendant guaranteed prompt payment to subcontractors and
suppliers, such as plaintiff, of any undisputed amounts for
work performed and materials supplied in connection with
Marson's work on the Project. (*See* Payment Bond §§ 1, 6.)

In relevant part, New York State Finance Law §
137(3) provides that "[e]very person who has furnished
labor or material, to the contractor or to the
subcontractor . . ., shall have the right to sue on such
payment bond in his own name for the amount, or the balance
thereof, unpaid at the time of commencement of the action .
. . ."[2] Thus, even though plaintiff is not a party to the
Payment Bond, "it has standing to sue for payment under the
Bond." *See Underpinning & Found. Skanska, Inc. v.
Travelers Cas. & Sur. Co. of Am.*, No. 07-cv-3478, 2010 U.S.

_____

[2] The Subcontract provides that it "shall be interpreted and
governed by and under the laws of the State of New York . .
. ."  (Subcontract § 27.)

Dist. LEXIS 74249, at *7 (addressing as a threshold matter defendant surety's obligations under a payment bond to pay subcontractors (citing N.Y. State Fin. Law § 137(3))).

Further, defendant's "liability under the payment bond is measured by the liability of its principal," Marson, because "[i]t is a well settled rule in [New York] that the liability of the surety is measured by the liability of the principal." *Id.*, at *8 (citations and internal quotation marks omitted; alterations in original); *see Morse/Diesel, Inc. v. Trinity Indus.*, 67 F.3d 435, 445 (2d Cir. 1995); *Morin v. Empiyah & Co.*, LLC, 389 F. Supp. 2d 506, 515 (S.D.N.Y. 2005) (collecting cases). Accordingly, because plaintiff asserts that it sought payment from Marson for labor and materials allegedly covered by the Subcontract, and that Marson has failed to remit full payment in satisfaction thereof (*see* Compl. ¶ 16), plaintiff has a claim against Travelers, as Marson's surety, for the claimed amounts, less any allowable setoffs. *See Underpinning & Found. Skanska*, 2010 U.S. Dist. LEXIS 74249, at *8-9 (finding that plaintiff subcontractor had standing to assert a claim against contractor's surety for unpaid sums allegedly due pursuant to an agreement whereby subcontractor agreed to perform pile driving work and related services).

**C. Disputed Setoffs and Defenses**

The court next considers the disputed setoffs and defenses that form the bases of plaintiff's instant motion.

**1. Obstructions**

Underpinning and Marson recognized that during the installation of caissons, plaintiff could encounter underground obstructions. (*See* Subcontract, Scope of Work Rider ¶ 48.)  Thus, they agreed in paragraph 48 of the Scope of Work Rider that Underpinning "will be paid for lost time due to obstructions @ the rate of $1,300 per hr for labor and equipment to be invoiced monthly." (*Id.; see* Pl. 56.1 Stmt. ¶ 8.)

During performance of the Subcontract, plaintiff encountered obstructions and drilled through them.  (Pl. 56.1 Stmt. ¶ 9.)  Each time that plaintiff drilled through obstructions, it submitted an extra work order to Marson to document the time spent and any materials consumed.  (*Id.* ¶ 10; Def. 56.1 Stmt. ¶ 10; *see generally*, Coleman Decl., Ex. C, Extra Work Orders.)  The extra work orders recorded cutting bits or "teeth" consumed.  (Pl. 56.1 Stmt. ¶ 11; Def. 56.1 Stmt. ¶ 11.)  Plaintiff requested payment of $44,203 for the cost of cutting bits and tool repairs, in addition to compensation at the $1,300 contractual hourly rate for "labor and equipment." (Pl. 56.1 Stmt. ¶ 12; Def.

56.1 Stmt. ¶ 12.)  Marson paid plaintiff the $1,300 hourly
rate for obstruction drilling.  (Pl. 56.1 Stmt. ¶ 13.)
Marson thereafter sought payment from the Owner for the
cost of cutting bits.  (Def. 56.1 Stmt. ¶ 13; Pl. 56.1
Stmt. ¶ 13.)  According to defendant, the Owner denied
payment to Marson for these expenses.  (Pl. 56.1 Stmt. ¶
13.)

The parties dispute whether the cost of cutting
bits and tool repairs are separately compensable under the
Subcontract.  In support of its motion for summary
judgment, plaintiff argues that the $1,300 hourly rate
prescribed by paragraph 48 of the Scope of Work Rider
explicitly covers only "labor and equipment" and not
cutting bits and tool repairs, which plaintiff contends are
more aptly described as "materials" because they are
"completely consumed by the obstruction drilling . . . ."
(Coleman Decl. ¶ 11; *see* ECF No. 40, Plaintiff's Memorandum
of Law in Support of Partial Summary Judgment Motion ("Pl.
Mem.") at 6.)

By contrast, defendant contends that the term
"equipment" is sufficiently ambiguous so as to preclude
summary judgment on the issue of whether cutting bits are
separately compensable as "materials" or whether they are
included in the $1,300 hourly rate for "labor and

12

equipment." (ECF No. 36, Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. Mem.") at 5-7.) Additionally, defendant asserts that cutting bits used to grind obstructions "are part of the equipment, even though they may be 'used up' during the course of their use, just as fuel powering the drill rigs is used up. The 'teeth' are not materials because they are not incorporated into the construction." (ECF No. 37, Declaration of Theodore Turko, dated 2/2/10 ("Turko Decl.") ¶ 10.) Defendant further asserts that the contractual $1,300 hourly rate was intended to be an "all inclusive . . . lump sum" amount. (ECF No. 37, Declaration of Walter Beal, dated 2/2/10 ("Beal Decl.") ¶ 7.) Defendant alternatively requests that the court "find as a matter of law that Underpinning is not entitled to the cost of the cutting bits or teeth in addition to the hourly rate . . . ." (Pl. Mem. at 7) (emphasis in original.)

The court concludes that the word "equipment" in paragraph 48 of the Scope of Work Rider Even is ambiguous when read in the context of the entire Subcontract. Specifically, section 2, *inter alia*, provides that "the work of the Subcontractor [Underpinning] . . . shall be to furnish and perform all materials, equipment, work, labor and services to fully perform the Caisson & Pile Foundation

[work] . . . ." (Subcontract § 2.) Further, section 3(c),
*inter alia*, provides that the work performed under the
Scope of Work Rider "includes all work, labor, equipment
and materials necessary and required to fully complete the
portion of [Underpinning's] Scope of Work . . . without
additional compensation . . . ." (Subcontract § 3(c).)
The omission of the word "materials" from paragraph 48 of
the Scope of Work Rider raises triable issues regarding the
parties' intentions as to whether cutting bits and tool
repairs are separately compensable because sections 2 and
3(c) of the Subcontract provide that Underpinning must
furnish its own equipment and materials and that plaintiff
is not entitled to additional compensation for such
expenses. Thus, summary judgment on this issue is
inappropriate. *See LaSalle Bank Nat'l Ass'n v. Nomura
Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005)
("when the meaning of the contract is ambiguous and the
intent of the parties becomes a matter of inquiry, a
question of fact is presented which cannot be resolved on a
motion for summary judgment.") (citation and internal
quotation marks omitted). Accordingly, plaintiff's motion
for summary judgment to exclude defendant's setoff and
defense related to obstructions and the cost of cutting
bits and tool repairs is denied.

## 2. Labor Charges

Defendant seeks to recoup expenditures paid by Marson to employ a master mechanic and maintenance foreman who were retained in connection with plaintiff's performance of its work. It is undisputed that Marson employed the master mechanic and maintenance foreman on its own payroll. (Pl. 56.1 Stmt. ¶ 19; Winkler Decl., Ex. G, Excerpts from the Deposition of Walter Beal ("Beal Dep.") at 58-60.) Plaintiff maintains that the Subcontract "does not have a provision imposing an obligation on Underpinning to reimburse Marson for master mechanics employed on Marson's own payroll." (Pl. 56.1 Stmt. ¶ 20.) Mr. Beal, Marson's Vice President of Business Operations, testified that Marson placed the master mechanic and maintenance foreman on its payroll because it was obligated as a general contractor to "make sure that there's labor harmony . . . and benefits are paid . . . ." (Beal Dep. at 58-59; *see* Pl. 56.1 Stmt. ¶ 18.) It is undisputed (1) that the master mechanic and maintenance foreman were required because of the equipment that plaintiff used to perform the work, (2) they did not perform any work for Marson, and (3) Marson did not direct of their work. (Beal Decl. ¶ 13; *see also* ECF No. 37, Declaration of Eric Rizzo, dated 2/2/10 ("Rizzo Decl.") ¶¶ 13-16.) There is, however, a question

whether the master mechanic and maintenance foreman were
required to be present or performed work for any
subcontractor other than Underpinning.

Defendant claims that the Subcontract "contains
numerous provisions requiring Underpinning to reimburse
Marson for expenses made by Marson on behalf of
Underpinning."  (Def. 56.1 Stmt. ¶ 20.)  Among other
provisions, defendant cites to Section 16(e) of the
Subcontract, which provides:

> The Subcontractor [Underpinning] shall pay
> for all materials, equipment and labor used
> in connection with the performance of this
> Subcontract through the period covered by
> previous payments received from the General
> Contractor . . . .

(Subcontract § 16(e).)

Contrary to plaintiff's contention, Section 16(e)
does not limit Underpinning's obligation to pay for "labor
used in connection with" its performance.  Instead, Section
16(e) obligates plaintiff to pay for "all" such expenses,
regardless of whether the expense initially was paid by
Marson.  Accordingly, plaintiff's motion for summary
judgment excluding Travelers's setoff and defense related
to labor charges for the master mechanic and maintenance
foreman is denied.  Because it is unclear whether the
master mechanic and maintenance foreman were retained by

Marson for work performed by any subcontractor other than
Underpinning, the application and amount of any setoff or
defense is better left for trial.

### 3. Re-design Credit

Underpinning anticipated that certain elements of
the architects and engineer's design of the caisson
foundation could be redesigned to save money and time.
(Coleman Decl. ¶ 21.)  To that end, plaintiff and Marson
agreed to share any resulting cost savings.  (*Id.; see* Pl.
56.1 Stmt. ¶ 24.)  Their agreement was memorialized in
paragraph 46 of the Scope of Work Rider, which provides
that

> This subcontractor [Underpinning]
> anticipates a cost savings redesign.  To the
> extent such redesign is accepted by all
> those having interest, it is understood and
> agreed that such savings shall be shared,
> sixty (60%) percent "Marson", forty (40%)
> percent "UFS" [Underpinning].

(Subcontract, Scope of Work Rider ¶ 46.)

Plaintiff submitted to the Project architect and
engineers a redesign of certain aspects of the caisson
foundation work.  (Coleman Decl. ¶ 22; Pl. 56.1 Stmt. ¶
25.)  Among other things, plaintiff proposed that
"Osterberg cell load tests" be utilized instead of
"compression/tension load tests" for evaluating the load
capacity of caissons, a proposal which was accepted by the

Project architect and engineers, the New York City Transit Authority and New York City Department of Buildings. (Coleman Decl. ¶¶ 22-23; *see* Pl. 56.1 Stmt. ¶ 29; Def. 56.1 Stmt. ¶ 29.) The load test redesign resulted in a savings of $41,761. (Coleman Decl. ¶ 23.) Under the 60/40% formula provided in paragraph 46 of the Scope of Work Rider, Marson was entitled to a $25,056.60 credit for the redesign. (*Id.; see also* Pl. 56.1 Stmt. ¶ 30; Def. 56.1 Stmt. ¶ 30.)

Defendant maintains that the "elimination of certain tests" and the use of Osterberg cell load tests does not "constitute a redesign to which the 60/40 split" applies, and thus Marson is "entitled to a full credit" of the $41,761 cost savings. (Def. 56.1 Stmt. ¶ 31; *see* ECF No. 37, Declaration of Anthony Bochichio, dated 2/3/10 ("Bochichio Decl.") ¶ 35.) Defendant contends that the change in the load testing method is not a "redesign" under the Subcontract because "[t]he testing did not change the design of the Project." (*Id.*) Defendant, however, does not cite any contractual provision that defines "redesign" as a change to the design of the Project.

Contrary to defendant's contention, the language of paragraph 46 of the Scope of Work Rider does not limit the applicability and meaning of "redesign," nor

distinguish between savings that may result from the
redesign of a load capacity test and redesign of the
Project. Instead, paragraph 46 provides without specific
limitation that any "cost savings" from "redesign" shall be
shared between Marson and plaintiff, 60/40%, respectively.

To the extent defendant contends that the term
"redesign" is ambiguous as applied to the present dispute,
Marson's Vice President of Business Operations, Walter
Beal, testified that he believed that the change in load
capacity testing "is within that provision in the
subcontract for the 60/40 split for redesign savings[.]"[3]
(Beal Dep. at 88.) Thus, by Marson's admission, it is not
entitled "full credit" of the cost savings which resulted
from the change in the load testing method. Accordingly,
the court grants plaintiff's motion for summary judgment
and denies Travelers's setoff or defense for the same.

### 4. Architect's Supplemental Instruction No. 1

Marson requested plaintiff to submit a price for
additional caisson foundation work necessitated by an

---

[3] Defendant proffers the declaration of Marson's Vice
President, Anthony Bochichio which states, *inter alia*, that
the change in the load testing method "does not constitute
a 'redesign'." (Bochichio Decl. ¶ 35.) Defendant may not,
however, raise an issue of fact by submitting a declaration
of Maron's representative in opposition to plaintiff's
summary judgment motion that contradicts Marson's prior
testimony. *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d
93, 104 (2d Cir. 2010) (citation omitted).

Architect's Supplemental Instruction No. 1 ("ASI-1").
(Coleman Decl. ¶ 26; Pl. 56.1 Stmt. ¶ 32.) Underpinning
thereafter submitted an estimate of nearly $1,000,000 for
the ASI-1 work. (Coleman Decl. ¶ 26; *see* ECF No. 37,
Declaration of Robert Wasko ("Wasko Decl."), Ex. 14, Letter
from David Coleman, dated 2/16/06 ("Coleman 2/16/06 Ltr.")
at Bates No. UN 2422.) Defendant contends that the work
called for by ASI-1 was "part of the subcontract between
Marson and Underpinning from the very beginning" (Turko
Decl. ¶ 12), because the ASI-1 drawing numbers were
attached to the Subcontract. (*Id.* ¶¶ 12-14; Bochichio
Decl. ¶ 10.)

Two months after the January 2006 Subcontract,
the Project's architect revised certain aspects of ASI-1
three times and, in March 2006, reissued ASI-1 in three
parts: ASI-1a, ASI-1b, ASI-1c. (Turko Decl. ¶ 19; Coleman
Decl. ¶ 27.) ASI-1b involved Underpinning's caisson
foundation work. (Coleman Decl. ¶ 27; Turko Decl. ¶ 19.)
Under cover of letter dated April 3, 2006, at Marson's
request, plaintiff submitted to Marson an estimate of
$260,368 for the work included in ASI-1b. (Coleman Decl. ¶
27; Coleman Decl., Ex. I, Letter from David Coleman, dated
4/3/06 ("Coleman 4/3/06 Ltr.") at Bates No. UN 6062; Turko
Decl. ¶¶ 20-21.) The estimate specified numerous costs and

credits which resulted from ASI-1b, as well as additional
charges for labor, equipment and materials. (*Id.*, at Bates
Nos. UN 6059-62.) Plaintiff's April 3, 2006 letter
indicated that Underpinning "will not proceed with ordering
materials associated with this change before receiving an
approval Change Order or Construction Change Directive from
the Architect and Owner." (*Id.*, at Bates No. UN 6058.)

After receiving plaintiff's price estimate for
ASI-1(b), Marson sent a price proposal for ASI-1b to the
Owner. (Pl. 56.1 Stmt. ¶ 38.) It is undisputed that
Marson used plaintiff's price estimate in preparing its own
price proposal for ASI-1. (*Id.* ¶ 39; Def. 56.1 Stmt. ¶
39.) In turn, Marson received a change order from the
Owner providing for additional compensation for ASI-1,
which reflected plaintiff's price proposal for ASI-1b.
(*Id.* ¶ 40; Def. 56.1 Stmt. ¶ 40.)

By letter dated April 24, 2006, Theodore Turko,
Marson's Project Manager for the Project, advised Mr.
Coleman as follows:

> You are hereby directed to proceed with the
> work indicated in ASI #1. Please release
> all material associated with this change and
> proceed with the work so as not to delay the
> project schedule.

(Coleman Decl., Ex. J, "Turko 4/24/06 Ltr.").) Mr. Turko
states that this letter was sent "to get Underpinning

started in ordering materials[,]" but that Marson did not send plaintiff a change order because the work was part of the Subcontract.  (Turko Decl. ¶ 28.)

By letter dated April 24, 2006, Mr. Coleman again requested that Underpinning be provided with a change order or a construction directive before proceeding with the work prescribed by ASI-1b.  (Coleman Decl., Ex. L, "Coleman 4/24/06 Ltr."); *see* Pl. 56.1 Stmt. ¶ 36.)  In response, Marson sent to Coleman a copy of a Construction Change Directive ("CDC-1"), dated April 19, 2006, between the Owner, architect and Marson.  (Def. 56.1 Stmt. ¶ 36; Turko Decl. ¶ 28; Coleman Decl., Ex. L, CDC-1.)

There is no dispute that plaintiff performed the work included in ASI-1(b) and no dispute that Marson was compensated by the Owner for the changed caisson foundation work included in ASI-1(b).  (Pl. 56.1 Stmt. ¶¶ 41-42.) Instead, Travelers contends that plaintiff should not be paid for the ASI-1b work because such work was included in the Subcontract and because Marson never issued a "change order."  (Pl. Mem. at 13; Turko Decl. ¶ 28; *see* Def. 56.1 Stmt. ¶ 36.)

Plaintiff and Marson recognized that during performance of the Subcontract, changes in the work may be

necessary.  To that end, plaintiff and Marson, *inter alia*,

agreed as follows:

> Subcontractor [Underpinning] may be ordered
> in writing by the General Contractor
> [Marson], without invalidating this
> Agreement, to make changes in the Work
> consisting of additions, deletions or other
> revisions . . . .  The Subcontractor shall
> not have, nor make any claim for
> compensation or damages for alleged extra or
> additional work unless done pursuant to a
> written change order executed in advance by
> an executive officer of the General
> Contractor, or other agent – its field
> representative – duly authorized by General
> Contractor.

(Subcontract § 5(a).)  The Subcontract does not specify the

form in which a "written change order" must be executed.

The record before the court presents a genuine

factual dispute as to whether the work called for by ASI-1b

was included in the scope of the Subcontract or whether it

is separately compensable as "extra or additional work"

pursuant to section 5(a) of the Subcontract.  Although ASI-

1 drawings were included in a list of drawings incorporated

by reference into the Subcontract (Bochichio Decl. ¶ 10;

Turko Decl. ¶ 12), there is sufficient ambiguity as to

whether drawings and work called for under ASI-1b were

similarly intended to be incorporated into the Subcontract.

Moreover, the course of dealings between

plaintiff and Marson further raises a triable issue of fact

as to whether ASI-1b was included in the Subcontract. *See Analect LLC v. Fifth Third Bancorp*, 636 F. Supp. 2d 181, 188 (E.D.N.Y. 2008) (observing that "the court may consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract." (quoting *New York State Law Officers Union v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) (internal quotation marks omitted))). Specifically, Mr. Coleman's April 3, 2006 letter and Mr. Turko's April 24, 2006 letter both refer to the work called for by ASI-1b as a "change." (Coleman Decl., Exs. I-J.) Additionally, there is evidence that Marson utilized plaintiff's price proposal for the ASI-1b work in formulating its own estimate to the Owner and that Marson received a change order and additional compensation from the Owner for the ASI-1b work. (See Pl. 56.1 Stmt. ¶¶ 36-42; Def. 56.1 Stmt. ¶¶ 36-42; Turko Decl. ¶¶ 27-28.) Accordingly, in view of the material factual disputes surrounding the issue of whether ASI-1b work was included in the Subcontract, summary judgment is denied.

### 5. Certified Payroll Information

Travelers asserts that plaintiff failed to comply with its "contractual requirement" to submit weekly certified payroll information to Marson or the New York City Department Housing Preservation and Development

("HPD"), and that the Owner and HPD have withheld funds from Marson as a result.[4] (*See* Def. Rule 26 Disclosures at 5.)  Plaintiff asserts that it complied with its obligation to provide certified payroll information and that to date, HPD has not notified plaintiff of any deficiency in its payroll documentation.  (Coleman Decl. ¶¶ 17-18.)

It is undisputed that HPD determined that plaintiff was in compliance with its obligation to provide HPD with certified payroll information through January 5, 2007.  (Wasko Decl., Ex. 16, Excerpts from the Deposition of David Coleman ("Coleman Dep.") at 206-07; Wasko Decl., Ex. 18, Excerpts from the Deposition of David Rosenthal ("Rosenthal Dep.") at 50-51.)  It is also undisputed that plaintiff's employees performed work on the Project after January 5, 2007, in March and April of that year (Wasko Decl., Ex. 15, Excerpts from the Deposition of Timothy Miller ("Miller Dep.") at 47-49) and that HPD was not aware of plaintiff's post-January 2007 work on the Project until after it had determined that plaintiff was in compliance with its certified payroll requirements.  (*See* Rosenthal

---

[4] Neither party has identified the specific contractual provision which purports to obligate plaintiff to submit certified payroll documents.  Notwithstanding, plaintiff acknowledges that it was requested by Marson to disclose certified payroll information and that it did so.  (*See* Coleman Decl. ¶ 17.)

Dep. at 31-32.)  Although HPD has not reversed its
determination that plaintiff had complied with its
certified payroll requirements (*id.* at 40), there is no
evidence that HPD has completed its review of any
additional certified payrolls records.  (*Id.* at 34, 40, 52-
53.)  Summary judgment on this issue is therefore
premature.[5]  Accordingly, plaintiff's motion for summary
judgment on the "certified payroll issue" is denied.

### 6. Miscellaneous Damage

During performance of the Subcontract,
Underpinning damaged a staircase on a worksite trailer and
a fence on a neighboring property.  (Miller Dep. at 144-
48.)  By letter dated December 15, 2006, Mr. Turko advised
plaintiff of the damaged fence and requested that plaintiff
"advise on how you would like to address these damages."
(Wasko Decl., Ex. 21; *see* Miller Dep. at 145.)  Plaintiff
responded by letter dated December 22, 2006 stating that
"Underpinning would prefer that Marson submit an invoice
for the necessary repairs with the appropriate backup so we
can pay this separately as apposed [sic] to deducting this
from our original contract."  (Wasko Decl., Ex. 22; *see*

_____

[5] Should additional facts emerge regarding the status of
HPD's review of certified payroll information, such facts
shall be disclosed in a timely manner in accordance with
Fed. R. Civ. P. 26(e).

Miller Dep. at 146.)  Defendant initially sought $31,500

for the damaged property (Def. Rule 26 Disclosures at 6),

and now proffers admissible evidence that the fence cost

"at least $17,740.80" to repair.  (Rizzo Decl. ¶ 35.)

Defendant has produced an invoice for $257.24 to document

the staircase repair costs.  (Pl. 56.1 Stmt. ¶ 44; Def.

56.1 Stmt. ¶ 44.)

Plaintiff contends that based upon Marson's

failure to document its repair costs, summary judgment

should be granted in plaintiff's favor on Travelers's

setoff for the amount of damage caused by plaintiff to the

fence and staircase.  Plaintiff relies upon *Intermetal*

*Fabricators, Inc. v. Losco Group, Inc.*, No. 97-cv-3519,

2000 U.S. Dist. LEXIS 11622 (S.D.N.Y. Aug. 14, 2000), where

the court concluded that the defendant was not entitled to

labor costs because it failed "to come forward with any

documentation" in support thereof.  *Id.*, at *49.  The

*Intermetal* case, however, is procedurally inapposite

because there, the court made its determination following a

bench trial.

Here, based upon the record evidence, a

reasonable jury could find that defendant incurred costs to

repair the damaged fence and staircase.  (*See* Rizzo Decl.

¶¶ 34-35.)  Accordingly, summary judgment on the issue

fence and staircase repair costs is denied.

### 7. Delay Damages

Plaintiff and Marson recognized that there may be

delays in the completion of the Project.  To that end, the

Subcontract provides, in relevant part, that

> Subcontractor [Underpinning] agrees that if
> it shall intentionally delay the progress or
> completion of the Work so as to cause any
> delay, damage or expense to the General
> Contractor [Marson] and/or Owner in the
> progress or completion of the Project, or
> for which the General Contractor may or
> shall be liable to the Owner or any other
> person, firm or entity, Subcontractor shall
> immediately reimburse General Contractor and
> hereby agrees to save it harmless from and
> against any such damage or expense, except
> liquidated, consequential and/or
> compensatory damages.

(Subcontract § 4(b).)

Defendant asserts that plaintiff caused the

completion of the Project to be delayed.  (*See* Rizzo Decl.

¶ 20.)  Defendant further asserts that the Owner is

"assessing delay damages against Marson in the sum of at

least $1,937,002, part of which is attributable to the

delays caused by Underpinning."  (Def. 56.1 Stmt. ¶ 96; ECF

No. 37, Declaration of David Beer, dated 1/22/10 ("Beer

Decl.") ¶ 5(a).)  Defendant thus seeks an setoff for delay

damages allegedly attributable to plaintiff.  (*See* ECF No.

37, Declaration of Leon Marrano, dated 2/3/10 ("Marrano Decl.") ¶¶ 16-19.)

Plaintiff asserts that defendant has failed to plead any setoff or counterclaim for delay damages and that it cannot do so now. (ECF No. 41, Plaintiff's Reply Memorandum of Law ("Pl. Reply Mem.") at 10.) Defendant contends that it affirmatively raised a defense[6] arising out of plaintiff's alleged delay in performance and that the issue of delay damages has been explored in discovery.

Irrespective of whether defendant adequately pled an affirmative defense for delay damages, the parties have

---

[6] Defendant contends that the following affirmative defense pled in its Answer notified plaintiff of its intention to seek an setoff for delay damages:

> In addition to the defenses set forth herein, Travelers reserves all rights and adopts all defenses set forth and/or available to Marson. Travelers asserts by way of affirmative defense, setoff and recoupment all claims or counterclaims which may be asserted at a later date or, in another action, including, but not necessarily limited to, plaintiff's breaches of the agreement with Marson. Defendant is entitled to assert all those defenses of its principal, and to assert as defenses, set-off and/or recoupment all affirmative defenses or claims of Marson arising from the matters set forth in the complaint.

(ECF No. 4, Answer ¶ 35.)

pursued discovery relevant thereto[7] and plaintiff has not articulated how it has been prejudiced, if at all, by defendant's raising of this issue at this juncture. *See Lambrinos v. Exxon Mobil Corp.*, 349 Fed. Appx. 613, 615 (2d Cir. 2009) ("*[A]bsent prejudice to the plaintiff*, a defendant may raise an affirmative defense in a motion for summary judgment for the first time." (emphasis and alterations in original) (quoting *Steinberg v. Columbia Pictures Indus., Inc.*, 663 F. Supp. 706, 715 (S.D.N.Y. 1987))). Thus, defendant may properly assert an affirmative defense for delay damages.

Plaintiff further contends that defendant is not entitled to delay damages because neither defendant nor Marson has incurred damages for any delay in the Project's completion. (Pl. Reply Mem. at 10-11.) To the contrary, defendant also has proffered admissible evidence that the "Owner has asserted damages against Marson," a statement which is based upon the personal knowledge of Marson's President, Leon Marrano. (Marrano Decl. ¶ 18.)

---

[7] Indeed, plaintiff acknowledges that Marson's Project Manager, Theodore Turko, was asked during his deposition whether "any of Marson's subcontractors intentionally delay[ed] completion" of the Project, to which Turko responded "Not to my knowledge, no." (Turko Dep. at 281.) Although it is unclear how Mr. Turko has personal knowledge of, and is qualified to testify about, the subcontractors' intent, the testimony nonetheless demonstrates that plaintiff sought discovery on the issue of delay damages.

Plaintiff additionally contends that there is no evidence that it "intentionally" delayed progress or completion of its work and, consequently, it is not liable for delay damages under the Subcontract. (Pl. Reply Mem. at 11; *see also* Subcontract § 4(b).) In support, plaintiff asserts that "documentary evidence submitted by Travelers indicates that . . . Marson itself was responsible" for delays. (Pl. Reply Mem. at 11.)[8] Plaintiff's contention, however, highlights why summary judgment is not appropriate where, as here, a fact-finder more appropriately may assess whether plaintiff intentionally delayed progress or completion of the Project and to what extent Marson or others were responsible for any delays. Accordingly, summary judgment is denied on the issue of delay damages.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment is granted in part and denied in part. The parties are ordered to (1) return before Judge Pohorelsky for a settlement conference, to be attended by the parties and their counsel; (2) use their best faith

---

[8] Plaintiff cites to "Defendant's Ex. 6 (last page)" but does not otherwise identify the referenced document. Exhibit 6 of the Wasko Declaration – the only "Exhibit 6" submitted by the defendant – is an email chain between the HPD and defendant's counsel and does not refer to the alleged causes of any delays.

efforts to narrow and resolve the issues to be tried; and (3) confer regarding the length of the trial and dates of their availability for trial after December 10, 2010 and advise the court of the same, in writing, by September 30, 2010.

SO ORDERED.

Dated: Brooklyn, New York
       September 20, 2010

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York